```
                   UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS


                                  )
UNITED STATES OF AMERICA,         )
          Plaintiff,              )
                                  ) Criminal No. 10-10076-PBS
          v.                      )
                                  )
NEGUS CHIN,                       )
          Defendant.              )
                                  )
```

**MEMORANDUM AND ORDER**

October 21, 2014

Saris, U.S.D.J.

In the wake of the now infamous scandal involving Annie Dookhan, a former chemist at the William F. Hinton Drug Laboratory in Jamaica Plain, Defendant Negus Chin has moved to vacate his conviction and set aside his guilty plea pursuant to 28 U.S.C. § 2255. (Docket No. 60). Defendant contends that his plea was involuntary, unintelligent, and unknowing because Dookhan's derelictions at the drug lab were unknown to him at the time of his plea. Had the government disclosed these misdeeds, defendant argues that he would have proceeded to trial instead of pleading guilty. The government opposes defendant's motion and has requested summary dismissal. (Docket No. 73). For the following reasons, Defendant's Motion to Vacate is **DENIED**.

**FACTUAL AND PROCEDURAL BACKGROUND**

1

The facts underlying defendant's guilty plea are largely undisputed. Around 3 a.m. on February 28, 2010, defendant was arrested after selling to an undercover police officer a substance believed to be crack cocaine. The undercover officer had been brought to defendant by a man later identified as Shawn Boyd. On Boyd's instruction, the officer asked defendant for "3 for 40." Defendant initially resisted, saying that he did not know the officer "like that" and asking to see the officer's identification. When the officer stated that he had no identification, defendant asked to see the $40 instead. The officer responded that he wanted to see the crack first. Defendant opened his mouth, revealing several wrapped packages of what appeared to be crack cocaine, and told the officer, "I have the shit."

The officer then handed defendant $40 in prerecorded bills. Defendant took the money and removed two packages of suspected crack cocaine from his mouth and handed them to Boyd, telling him that he wanted the officer to smoke one of the rocks in front of him. Boyd complied, handing one of the two bags to the officer and placing the contents of the second bag into a pipe. The officer refused to smoke the crack cocaine and walked away from defendant and Boyd with one bag of suspected crack cocaine.

Shortly after the undercover informed his partner that the transaction was complete, police arrested defendant. The police

recovered the $40 that the undercover officer had given him, along with an additional $116 in cash and a cell phone. Police also inspected the remaining bag of suspected crack cocaine purchased by the undercover and field tested the substance, which tested positive for the presence of cocaine.

The focal point here is that the police next sent the bag of suspected crack cocaine to the Hinton Drug Laboratory in Jamaica Plain for analysis. The lab returned a certification, signed by chemists Nicole Medina and Daniel Renczkowski, stating that the substance contained 0.08 grams of cocaine. Chemist Annie Dookhan's name does not appear on any of the relevant documentation relating to defendant's case, although she was employed at the lab as a chemist while the substance was analyzed.

On December 7, 2010, defendant pleaded guilty to one count of possessing with intent to distribute and distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.[1] At the plea hearing, defendant did not disagree with the government's statement that he had been in possession of cocaine and distributed it to Shawn Boyd, knowing that Boyd would give it to the undercover officer in exchange for money. He told the court on several occasions during the colloquy that he distributed cocaine. Defendant also told the Court that he had

---

[1] No test was done for cocaine base.

previously been treated for addiction to marijuana and crack cocaine, and he was suffering from addiction at the time of his arrest.

Because defendant had two previous drug trafficking convictions in 2002 and 2006, and one for assault and battery with a dangerous weapon, the Presentence Report classified defendant as a career offender pursuant to United States Sentencing Guidelines (USSG) § 4B1.1. Because of this designation, defendant's total offense level jumped from 10 to 29, which correlated with a guidelines range of 151 to 188 months of imprisonment after taking into account defendant's criminal history category of VI. The government recommended a downward variance to 132 months of imprisonment. The Court sentenced defendant to 96 months of imprisonment on June 23, 2011.

In August 2012–a little more than a year later–the public first heard the news that chemist Annie Dookhan had falsely certified drug test results and tampered with samples at the Hinton Drug Lab. On August 30, 2013, defendant filed his § 2255 motion, (Docket No. 60), which was stayed at the parties' request until the Massachusetts Inspector General (OIG) released its report following an investigation of the lab. (Docket No. 63, 66). This report, released on March 4, 2014, states in relevant part:

> Dookhan was the sole bad actor at the Drug Lab. Though many of the chemists worked alongside Dookhan for years, the OIG found

> no evidence that any other chemist at the Drug Lab committed any malfeasance with respect to testing evidence or knowingly aided Dookhan in committing her malfeasance. The OIG found no evidence that Dookhan tampered with any drug samples assigned to another chemist even when she played a role in confirming another chemist's test results.
> ...
> [T]he OIG found no evidence to support treating cases in which Dookhan had no known interaction with the drug sample in question with any increased level of suspicion related to Dookhan.

(Docket No. 76:9, 11). Defendant filed a supplemental memorandum on April 30, 2014, (Docket No. 72), and the government filed its opposition on May 19, 2014, (Docket No. 73). Defendant's motion to vacate is now ripe for resolution.

## LEGAL STANDARDS

Title 28 U.S.C. § 2255(a) allows for a prisoner to collaterally attack his sentence when it "(1) was imposed in violation of the Constitution, or (2) was imposed by a court that lacked jurisdiction, or (3) exceeded the statutory maximum, or (4) was otherwise subject to collateral attack." David v. United States, 134 F.3d 470, 474 (1st Cir. 1998). The burden is on the petitioner to make out a case for relief under § 2255. Id.

Generally speaking, "a voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked." Mabry v. Johnson, 467 U.S. 504, 508 (1984), overruled in part on other grounds by Puckett v. United States, 556 U.S. 129 (2009). But the First Circuit has held that § 2255 motions are "not necessarily a

5

dead end" for prisoners who pleaded guilty. <u>Wilkins v. United States</u>, 754 F.3d 24, 28 (1st Cir. 2014). For example, "a prisoner can collaterally attack his sentence on the ground that his guilty plea was not knowing or voluntary if his claim is based on evidence not available to him at the time of the plea." <u>Ferrara v. United States</u>, 456 F.3d 278, 289 (1st Cir. 2006).

To prevail on this ground, a defendant must make two showings. "First, he must show that some egregiously impermissible conduct (say, threats, blatant misrepresentations, or untoward blandishments by government agents) antedated the entry of his plea." <u>Id.</u> at 290. "Second, he must show that the misconduct influenced his decision to plead guilty or, put another way, that it was material to that choice." <u>Id.</u> To satisfy this second prong of materiality, a defendant must establish "a reasonable probability that, but for [the misconduct], he would not have pleaded guilty and would have insisted on going to trial." <u>Hill v. Lockhart</u>, 474 U.S. 52, 59 (1985). "A reasonable probability is a probability sufficient to undermine confidence in a belief that the petitioner would have entered a plea." <u>Ferrara</u>, 456 F.3d at 294. In a recent § 2255 case involving a drug sample analyzed at the Hinton Drug Lab, the First Circuit said that a defendant must "convince us that there is a reasonable probability that, considering the totality of the circumstances, he would not have pleaded guilty had he known of

6

Dookhan's transgressions." <u>Wilkins</u>, 754 F.3d at 31. A large <u>Hill</u> to climb indeed in the circumstances of this case.

"In mounting an inquiry into these elements, a court must consider the totality of the circumstances surrounding the plea." <u>Ferrara</u>, 456 F.3d at 290. Relevant factors include, but are not limited to, whether the withheld information: (1) would have detracted from the factual basis used to support the plea; (2) could have been used to impeach a witness whose credibility may have been outcome-determinative; (3) was cumulative of other evidence already in the defendant's possession; (4) would have influenced counsel's recommendation as to the desirability of accepting a particular plea bargain; and (5) was outweighed by the benefits of entering into the plea agreement. <u>Id.</u> at 294.

## **DISCUSSION**

Against this legal backdrop, the Court finds that defendant is not entitled to § 2255 relief because he cannot establish the materiality of the government misconduct. That is, defendant has not established a reasonable probability that he would not have pleaded guilty and would have insisted on going to trial if the government had disclosed to him information regarding Annie Dookhan and the Hinton Drug Lab scandal. This conclusion is based on several factual findings.[2]

---

[2]Because defendant fails to satisfy <u>Ferrara</u>'s second prong-materiality-the Court will not reach defendant's arguments regarding whether the government's alleged misconduct constituted

7

First, defendant has not argued that the substance he sold to the undercover police officer was not, in fact, cocaine. Nor, on this record, could he. At his change of plea hearing, defendant admitted in open court that he had been in possession of cocaine and distributed it to the undercover officer in exchange for money. Because of the career offender designation, the weight of the cocaine was irrelevant. These admissions are "entitled to significant (albeit not dispositive) weight when, as now, he seeks to vacate that plea through a collateral attack." Wilkins, 754 F.3d at 30. "And such an admission is especially compelling because the petitioner neither attempts to explain it away nor makes any assertion of factual innocence." Id.; see also United States v. Parrilla-Tirado, 22 F.3d 368, 373 (1st Cir. 1994) (explaining that the absence of a claim of innocence "cuts sharply against allowing [a defendant's] motion to withdraw his guilty plea").

Second, the Court has serious doubts about whether defendant would proceed to trial in light of the government's ability to present overwhelming circumstantial evidence that the substance sold by defendant was, in fact, cocaine. For example, police officers at the scene of defendant's arrest identified the substance sold to the undercover as crack cocaine, and field

---

"egregiously impermissible conduct" under Ferrara's first prong. 456 F.3d at 290.

tests conducted by the officers returned positive results for cocaine as well. These observations all took place before the drug sample was sent to the Hinton Drug Lab.

Defendant's actions were also consistent with a drug dealer who knew that he was selling the real deal, not counterfeit drugs. Defendant concealed his wares in small pouches inside his mouth and was initially reluctant to deal with the undercover. But once he decided to sell, defendant stated, "I have the shit," and even demanded that the undercover smoke one of the rocks in front of him. It appears unlikely that defendant would have told a new customer to smoke some of the substance on the spot unless he believed it was authentic. Given the enormity of this evidence waiting for defendant at trial, defendant had strong reasons to plead guilty.

Defendant was also unlikely to proceed to trial because of the attractive concessions the government offered in exchange for his plea. See Ferrara, 456 F.3d at 294 (observing that the value of the sequestered evidence may be outweighed by the benefits of entering into the plea agreement). Defendant was promised that if he pleaded guilty, the government would recommend a sentence of no higher than 151 months and withdraw an information it had filed pursuant to 21 U.S.C. § 851 establishing defendant's prior drug trafficking convictions. The government also promised to agree to a three-point reduction for acceptance of

responsibility, even though defendant pleaded guilty just one week prior to the start of trial. Given the costly risks of proceeding to trial, the Court finds it unlikely that mere knowledge of the Dookhan scandal and other lapses at the drug lab would have compelled defendant to forgo a plea. See United States v. Merritt, 755 F.3d 6, 11 (1st Cir. 2014) (holding that district court did not abuse its discretion in concluding that this "gambit [of proceeding to trial] would not have been worth a roll of the dice" when there was no evidence that the drug transaction was a sham sale).

It is also unlikely that information about the Dookhan scandal would have weighed heavily in defendant's decision to plead guilty because there is no evidence that the drug sample here was tampered with, analyzed, or even touched by Annie Dookhan. The substance was analyzed by chemists Nicole Medina and Daniel Renczkwoski, and there is no indication that either of these two chemists participated in any malfeasance at the drug lab. To the contrary, the OIG report emphasizes that "Dookhan was the sole bad actor at the Drug Lab," and there is no evidence suggesting that test results need to be questioned where Dookhan had no known interaction with the drug sample. (Docket No. 76:9, 11); see also Wilkins, 754 F.3d at 29 (rejecting petitioner's argument that "Dookhan's wrongdoing was so malignant . . . that it infected everything that was at the Hinton Lab").

10

Defendant responds that there are other reasons why the drug testing in his case is dubious, even if Dookhan was not involved. For example, aside from Dookhan, the OIG report documented a number of systematic problems at the Hinton Drug Lab, including (1) lax lab security; (2) gaps in chain-of-custody documentation; and (3) failure to disclose when chemists would run a sample through the Gas Chromatography and Mass Spectrometry (GC/MS) machine multiple times because of inconsistent findings. In essence, defendant argues that the integrity of <u>all</u> samples tested at the Hinton Drug Lab must be questioned, not just those analyzed by Dookhan.

Defendant's retort is not without force. It is easy to imagine how defendant could have used the OIG report to score points while cross-examining chemists from the Hinton Drug Lab at trial. But the potential for impeachment of an expert witness is not sufficient on its own to meet the <u>Ferrara</u> materiality standard. <u>See</u> <u>Ferrara</u>, 456 F.3d at 294 (listing impeachment of a witness whose credibility may have been "outcome-determinative" as just one of the "multiplicity of factors [that] may influence a defendant's decision to enter a guilty plea"); <u>see also</u> <u>Ritchey v. Johnson</u>, 95 F.3d 49, 49 (5th Cir. 1996) (unpublished) (denying defendant's habeas petition where a serologist had falsified samples in other cases given that defendant had "not shown how any such evidence could have implicated the voluntariness of his

11

plea"); United States v. Olsen, 704 F.3d 1172, 1184-87 (9th Cir. 2013) (finding no violation of Brady v. Maryland where the prosecution did not inform defendant that a forensic scientist had been the subject of a state investigation for contamination of samples and perjury because there was no reasonable probability that the verdict would have been different had the evidence been disclosed to the jury). Rather, defendant must show a reasonable probability that he would have proceeded to trial instead of pleading guilty had he known of the withheld information.

With respect to the other identified flaws at the lab, the Court's review of the drug lab control sheets for defendant's case suggests that no one other than chemist Nicole Medina handled defendant's sample while it was at the lab. See Gov't Opp. To Motion to Vacate, Exh. 10. The government has also submitted evidence that this was not one of the cases where chemists failed to disclose that they had run a sample through the GC/MS machine multiple times. Rather, the control card from the machine shows that defendant's drug sample was only tested once. Id. Without more compelling evidence that the drug results in defendant's case are untrustworthy, the Court does not find a reasonable probability that defendant would have proceeded to trial instead of pleading guilty.

Finally, defendant quotes selectively from recent decisions

of the Massachusetts Supreme Judicial Court in an effort to show that his conviction is suspect, despite the fact that Dookhan had no involvement in his case. See, e.g., Commonwealth v. Scott, 5 N.E.3d 530, 538 (Mass. 2014) (noting that the "full extent of Dookhan's misconduct may never be known"); Commonwealth v. Charles, 992 N.E.2d 999, 1019-20 (Mass. 2013) (explaining that there are "significant concerns about the administration of justice in criminal cases where . . . the drugs at issue were analyzed at that facility"). But these selective quotations are unavailing because the cases cited are distinguishable. In Scott, for example, the Court concluded that Dookhan's conduct is the "sort of egregious misconduct that could render a defendant's guilty plea involuntary." 5 N.E.3d at 546. But the Court limited its remedy only to cases where Dookhan served as a primary or confirmatory chemist. Id.; see also id. at 545 n.8 ("The record does not contain any allegations of wrongdoing by Dookhan . . . in any case in which she did not serve as the primary or confirmatory chemist."). Further, even where a defendant shows that Dookhan was a primary or confirmatory chemist on his case, Scott still requires defendants to establish a reasonable probability that they would not have pleaded guilty had they known of Dookhan's misconduct. Id. at 546 ("[W]e do not relieve the defendant of his burden under the second Ferrara prong to particularize Dookhan's misconduct to his decision to tender a

guilty plea."). Meanwhile, the holdings in Charles all relate to the authority of special magistrates to stay executions of sentences and conduct guilty plea colloquies. 992 N.E.2d at 1005. None of those issues are relevant here. As a result, defendant's citations to recent decisions of the Massachusetts Supreme Judicial Court do not carry the day for him.

In sum, this case turns on whether defendant can establish a reasonable probability that he would have decided to go to trial instead of plead guilty had he known of the scandal involving Dookhan and the Hinton Drug Lab. After evaluating the totality of the circumstances, the Court finds that knowledge of the scandal would not have affected defendant's calculus of the costs and benefits of pleading enough to satisfy Ferrara's materiality prong. For the reasons stated above, defendant has not established a reasonable probability that he would have proceeded to trial instead of plead guilty had he known of the Hinton Drug Lab scandal.

## ORDER

Defendant's Motion to Vacate (Docket No. 60) is **DENIED**. The government's request for dismissal is **ALLOWED**. The Court **DENIES** the habeas motion and orders it **DISMISSED**.

/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge